**NORTHEAST WOMEN'S CENTER**

v.

**McMONAGLE, Michael, Wall, Joseph P., Murkum, Roland, Walton, Howard, Tenaglio, Henry, Morello, Stephanie, Breen, Annemarie, Jones, Ellen, Long, Kathy, Silcox, Susan, Armes, Paul C., Geis, Walter G., and O'Brien, John J., Codichini, James, Walton, Patricia, Sadler, Diane, Swyer, Miriam, Byrne, Mary, Corbett, Linda, McIlhenny, Thomas, Ludwig, Patricia, Lynch, Gerrald, Caponi, Margaret, Baker, Deborah, Herilhy, Thomas, Varallo, Pasquale, Stanton, John, Knorr, Anne, Connor, John, Stevens, Elliott, Hand, Harry, Wirfell, Laurie, Gaydos, Helena, Moran, Robert, Essex, Earl, McNamara, Patricia, Andracavage, Donna, Guerra, Juan, Hearn, Linda.**

**Appeal of Michael McMONAGLE, Dennis Sadler, Deborah Baker, Thomas Herilhy, Anne Knorr, Robert Moran, Joseph P. Wall, Roland Markun, Howard Walton, Henry Tenaglio, Stephanie Morello, Ellen Jones, Annemarie Breen, Susan Silcox, Paul C. Armes, Walter G. Geis, John J. O'Brien, Patricia Walton, Kathy Long, Helena Gaydos, Donna Andracavage, Juan Guerra, Margaret Caponi, Mary Byrne, Thomas McIlhenny and Patricia McNamara, Appellants.**

No. 88–1644.

United States Court of Appeals, Third Circuit.

Argued July 10, 1989.

Decided Nov. 9, 1989.

Denis V. Brenan (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., Theresa M. Connolly, Jenkintown, Pa., Thomas J. Short, Oreland, Pa., Christine Smith Torre, Woodlyn, Pa., for appellants.

Julie Shapiro (argued), Edmond A. Tiryak, Philadelphia, Pa., for appellee.

Before HIGGINBOTHAM, BECKER and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This is an appeal from an order awarding attorneys' fees under the civil RICO statute. Because the district court applied the proper legal standards in its fee award, we will affirm the lower court's order.

### I.

Plaintiff-appellee Northeast Women's Center, Inc. ("plaintiff" or "the Center") is a Pennsylvania corporation which provides abortions, pregnancy testing, and other gynecological services. The defendants-appellants ("defendants") are individuals who are strongly opposed to abortion and who have expressed their opposition in several demonstrations at the Center's location.[1]

---

1. As noted by Judge Sloviter in *Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d 1342, 1345–46 (3d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989), the plaintiff presented evidence at trial showing that the defendants unlawfully entered its premises on four occasions.

On December 8, 1984, approximately fifty anti-abortion protestors, including twelve defendants, stormed the clinic, knocking down Center employees who tried to prevent their entry, blocking access to the clinic rooms and strewing medical supplies on the floor. One employee testified that she was injured while attempting to prevent the protestors from entering a patient treatment room. Thirty persons were arrested for trespass after this incident.

On August 10, 1985, twelve defendants were arrested, and subsequently convicted, for defiant trespass after they rushed into the clinic. The protestors injured one employee and damaged some of the Center's medical equipment.

On October 19, 1985, several protestors, including twenty-four defendants, were arrested following another attempt to enter the Center. Two persons managed to rush through the Cen-

On August 20, 1985, the Center filed a civil action in the United States District Court for the Eastern District of Pennsylvania, naming as defendants thirteen individuals who allegedly disrupted the Center's operations by harassing the Center's clients and employees, trespassing on its property, and damaging its medical equipment. The complaint was later amended to name forty-two defendants. The Center sought damages and injunctive relief under the Sherman Antitrust and Clayton Acts, 15 U.S.C. §§ 1, 15 (1973), the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq. (1984), and under the common law torts of assault and battery, trespass, intentional infliction of emotional distress, libel, slander and intentional interference with contractual relations. On December 18, 1986, the court entered summary judgment for the defendants on the assault and battery and intentional infliction of emotional distress claims, Appellant's Appendix ("App.") at 42, and the plaintiff later withdrew its libel and slander claims.

The remaining RICO, trespass, and antitrust claims against thirty-one defendants were tried before a jury over three weeks in April and May, 1987.[2] On May 8, 1987, the court directed a verdict in favor of all defendants on the antitrust count, and in favor of four defendants on all extant claims. Northeast Women's Center, Inc. v. McMonagle, 670 F.Supp. 1300, 1313 (E.D.Pa.1987).

In response to interrogatories prepared by the court, the jury found the twenty-seven remaining defendants liable under RICO and assessed $887 in damages,[3] which was trebled by the court to $2661 pursuant to 18 U.S.C. § 1964(c). Twenty-four defendants were found liable for trespass, for which the jury assessed $42,087.95 in compensatory damages.[4] The jury also found that three defendants had interfered with the plaintiff's contractual relations with its employees, but assessed no damages on that claim, as it found no proximate loss resulting from the interference. In accordance with the verdict, the court entered a $44,748.95 judgment in favor of the Center, and granted injunctive relief on the Center's trespass claim. Northeast Women's Center, Inc. v. McMonagle, 665 F.Supp. 1147, 1163–64 (E.D.Pa.1987).[5] On March 31, 1988, the court denied the defendants'

ter's doors and three defendants were later convicted for defiant trespass.

On May 23, 1986, several individuals again invaded the Center's premises and conducted a sit-down protest in the clinic waiting room during which they castigated patients and ignored repeated requests that they leave the building. During the demonstration, one defendant stated, "We're going to shut this place down." Other defendants reportedly blocked the doors to the clinic and its building. Twenty-six protestors, including sixteen defendants, were arrested and fifteen defendants were convicted for criminal conspiracy, disorderly conduct, and/or defiant trespass.

The plaintiff also presented testimony that on these and other occasions the defendants were observed

photographing the patients, chanting through bullhorns, blocking building entrances, and surrounding and pounding on the windows of employees' cars.... Videotape evidence revealed demonstrators pushing, shoving and tugging on patients as they attempted to approach the Center, knocking over and crossing beyond police barricades and blocking the ingress of cars. A protestor is recorded stating, "I bet you ten to one this place doesn't last six months." Another added, "This place is going to be shut down." A doctor em-

ployed by the Center testified that the sound of chanting, amplified by bullhorns, was audible in the Center's operating room. Another doctor testified that this noise would put patients "under considerably greater stress," especially when going into or coming out of general anesthesia.

868 F.2d at 1346 (citations omitted).

2. The Center dismissed its claims against eleven defendants either before or during trial.

3. The RICO damage figure reflected the cost of repairing medical equipment damaged by the defendants.

4. The jury also assessed $48,000 in punitive damages on the trespass claim, but the court granted a judgment notwithstanding the verdict for defendants on that award. Northeast Women's Center, Inc. v. McMonagle, 665 F.Supp. 1147, 1160–61 (E.D.Pa.1987).

5. However, the court did not grant injunctive relief on the successful RICO claim, holding that the unclean hands doctrine barred such relief because a physician at the Center had not complied with the fetal inspection provision of the Pennsylvania Abortion Control Act, 18 Pa.Cons. Stat.Ann. § 3214(c). 665 F.Supp. at 1155–56.

motions for a new trial and for judgment notwithstanding the verdict, except as to one defendant whose motion for a j.n.o.v. was granted. *Northeast Women's Center, Inc. v. McMonagle,* 689 F.Supp. 465 (E.D. Pa.1988).[6]

On October 13, 1987, the Center filed a motion for attorneys' fees and costs pursuant to the fee-shifting provision of the civil RICO statute, 18 U.S.C. § 1964(c),[7] and the bad faith exception to the so-called American Rule.[8] The Center initially sought $84,713.23 in fees and $11,808.79 in costs. Subsequently, the plaintiff voluntarily reduced its fee demand to $76,888.67 in fees and $11,808.79 in costs.[9]

The court held a hearing on the plaintiff's fee petition on May 16, 1988. An attorney appearing on behalf of all of the defendants stated that the defendants would not present additional evidence or testimony, and wished to rest on the contentions in their briefs. App. at 306.

In its July 15, 1988 decision, the district court found that the $125 hourly rate charged by the plaintiff's lead counsel and the $90 rate charged by associate counsel were "reasonable and commensurate with prevailing rates in this area for attorneys possessing a similar degree of skill, experience and talent." App. at 307. The court then examined at some length the defendants' challenges to the number of attorney hours claimed by the plaintiff. Because the district court's injunction was issued pursuant to the trespass count, and not the RICO claim, the court excluded $18,443.75 in fees and $391.85 in costs related to the injunction proceedings. App. at 309–11. One hundred dollars in costs associated with the plaintiff's claim against the defendant who won a j.n.o.v. was also deducted from the plaintiff's claim. App. at 312.

The district court rejected the defendants' contention that the hours claimed should be reduced by seven eighths because the RICO claim was one of the eight claims in the plaintiff's complaint, and that the lodestar should be reduced further to take into account the fact that the plaintiff ultimately prevailed against only twenty-six of the forty-two defendants named in its amended complaint. The court reasoned:

> It is true that fees in this case are awarded under the RICO statute only. As such, they are awarded in relation only to plaintiff's successful RICO claim. *Cf. Baughman v. Wilson Freight Forwarding Co.,* 583 F.2d [1208,] 1216 [ (3d Cir. 1978) ] (attorney's fees awarded under Clayton Act are awarded only in relation to a successful anti-trust claim). However, defendants' proposition is not a rational formula for determining the hours reasonably expended litigating plaintiff's RICO claim. Defendants have not made any properly supported challenge to the plaintiff's claim as to the hours spent litigating the RICO claim as opposed to

**6.** Both sides appealed the district court's judgment. In our March 2, 1989 decision, we held that the lower court erred in applying the unclean hands doctrine and remanded for further consideration of the Center's claim for injunctive relief on its RICO claim. In all other respects, this Court affirmed the district court's judgment. *Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342 (3d Cir.1989).

**7.** 18 U.S.C. § 1964(c) provides:
Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

**8.** *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In *Alyeska,* the Supreme Court re-

affirmed the "American Rule," holding that absent contrary statutory direction, each party to a lawsuit must bear its own costs and attorney fees. However, the court also recognized a traditional equitable exception to this doctrine, in which a party may recover some or all of its litigation costs if its adversary conducted the proceeding in bad faith. 421 U.S. at 258–59, 95 S.Ct. at 1622.

**9.** The $7,824.56 reduction in the fee demand included $1,107.08 in fees that the defendants claimed were related to the defendants who were dismissed from the case, $3,279.98 in reductions agreed to during the deposition of plaintiff's counsel, and $3,437.50 in fees related to the plaintiff's dealings with the police rather than the defendants. App. at 305–06.

the other substantive claims in this case, or to the unreasonableness of the number of hours spent litigating the RICO claim. Defendants have not sought a downward adjustment of the lodestar.

This court notes that the claims which made up the bulk of the litigation were the RICO claim and the pendent state law claims of trespassing and intentional interference with contract. The claims for trespassing and RICO (especially as it pertained to the existence of an enterprise and pattern of activities) were proven by the same evidence—video-taped recordings of the defendants on or around plaintiff's property. Much of counsel's time was devoted to the development of the evidence and the litigation as a whole.

App. at 312–13.

However, the court found that $3,328.75 of the claimed fees were directly related to the plaintiff's trespass and unsuccessful antitrust claims, and accordingly reduced the award by that amount. The court also reduced the fees by $1,487.00 to exclude compensation for time spent on certain unnecessary post-trial contempt motions. However, with respect to the RICO claim, the court found that "[g]iven the novelty and complexity of the legal and factual issues presented and the time, labor, and effort required to successfully present the RICO claim, the number of hours expended by the plaintiff litigating the RICO claim appears reasonable." App. at 315.

In accordance with the above rulings, the court on July 15, 1988 entered its judgment for an award of $64,946.11 in attorneys' fees and costs. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

The basic standard for the determination of attorneys' fees awards in this Circuit was set out in our decisions in *Lindy Bros.*

*Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973) ("*Lindy I*"), and *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir.1976) (*in banc*) ("*Lindy II*"). Under the *Lindy* approach, an initial lodestar amount is determined by multiplying the number of hours reasonably expended by the prevailing attorneys on the successful claims by a reasonable hourly rate. *Lindy I*, 487 F.2d at 167–68; *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564–65, 106 S.Ct. 3088, 3097–98, 92 L.Ed.2d 439 (1986) (discussing *Lindy* approach). When a party prevails on only some of its claims, the fee award is to be based on the hours reasonably expended on the successful claims. *See Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983); *Inmates of Allegheny County Jail v. Pierce*, 716 F.2d 177, 181 (3d Cir.1983).[10]

The defendants do not dispute that the Center is entitled to recover attorneys' fees and costs related to its successful RICO claim. Nor do they challenge in this appeal the hourly rate of attorney compensation approved by the district court. They contend, however, that the fees and costs awarded to the plaintiff under the RICO statute are not "rationally related" to the plaintiff's RICO damages. They argue that the disproportionality between the $64,946.11 award of attorneys' fees and costs and the $887 in RICO damages (trebled to $2661) renders the fee award improper as a matter of law. Alternatively, the defendants assert that even if disproportionality does not automatically render the fee award improper as a matter of law, the district court nonetheless retains (and in this case failed to exercise) its discretion to consider the relationship between the plaintiff's RICO damages and its fee demand. The defendants also contend that

---

10. For extensive recent analyses of the law in this Circuit concerning the award and calculation of statutory attorneys' fees, *see Student Public Interest Group of New Jersey, Inc. v. AT & T Bell Laboratories*, 842 F.2d 1436 (3d Cir.1988);

*Dunn v. U.S.*, 842 F.2d 1420 (3d Cir.1988); *Cunningham v. City of McKeesport*, 807 F.2d 49 (3d Cir.1986) (*Cunningham II*), *cert. denied*, 481 U.S. 1049, 107 S.Ct. 2179, 95 L.Ed.2d 836 (1987).

the court erred in calculating the lodestar by failing to exclude compensation for time spent on the litigation of non-RICO claims, and in awarding fees "based on a fee petition which is unspecific and insufficient to satisfy the [Center's] burden of proof." Brief for Appellant/Defendant Patricia Walton ("Appellants' Brief") at 1–2.[11]

We shall examine these contentions in turn.

## A.

### *Proportionality of Fee Award* [12]

■ The district court observed that it may be "difficult to accept the concept that a jury's finding of $875.00 [sic] in damages for the RICO claim would support *reasonable* counsel fees and costs of $64,964.11." App. at 316 (emphasis in original). However, the court concluded that under *City of Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986), and *Cunningham v. City of McKeesport,* 807 F.2d 49 (3d Cir.1986) (*"Cunningham II"*), cert. denied, 481 U.S. 1049, 107 S.Ct. 2179, 95 L.Ed.2d 836 (1987), it could not reduce the fee award simply because of the relatively small RICO damages assessed by the jury. App. at 316.

Because the two decisions cited by the district court discuss the proportionality issue, it will be helpful to review both before discussing the defendants' position. In *City of Riverside,* eight Chicano plaintiffs brought a civil rights action against a municipality, its chief of police and thirty individual police officers, alleging that the police, acting without a warrant and with discriminatory animus, broke up a party

using tear gas and unnecessary physical force. A jury returned a verdict against the municipality and five officers, awarding damages in the amount of $33,350. The court then awarded the plaintiffs $245,-456.25 in fees and costs under the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988.

The Supreme Court affirmed. After considering the legislative history and the purposes of § 1988, Justice Brennan's plurality opinion rejected the view that civil rights attorneys' fees awards should be governed by a "rule of proportionality." The plurality stated that such a standard

would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts. This is totally inconsistent with the Congress' purpose of enacting § 1988. Congress recognized that private-sector fee arrangements were inadequate to ensure sufficiently vigorous enforcement of civil rights. In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case.

477 U.S. at 578, 106 S.Ct. at 2696 (footnote omitted).

Although Justice Powell believed that the fee award seemed unreasonable "on its face", he concurred in the Court's affirmance because of the district court's "detailed findings of fact" in support of a substantial fee award. 477 U.S. at 581, 106 S.Ct. at 2698 (Powell, J., concurring). In

---

**11.** Patricia Walton's brief has been adopted by the other twenty-five appellants. At oral argument, Walton's counsel represented that he was "presenting the arguments for all of the defendants." Transcript of July 10, 1989 Oral Argument (Tr. Oral Arg.) at 1.

**12.** The Center argues that the defendants did not preserve the issue of the proportionality of the RICO fee award by explicitly raising it in the court below, and thus that they are precluded from raising this issue here. Appellee's Brief at 18–19 n. 14; Tr. Oral Arg. at 20–23.

Although the defendants did not present their proportionality argument to the district court in

the extensive manner that they do now, they did ask the district court to consider "the appropriateness of any attorney claiming in excess of $80,000.00 for successfully litigating a claim with a damage award in the amount of $2661.00" Defendants' Supplemental Memorandum in Support of Defendants' Answer to Plaintiff's Motion for Attorney's Fees and Costs at 2. It is evident from the district court's decision that it considered the proportionality issue to be before it. App. at 316. We thus conclude that the defendants adequately preserved the proportionality issue for appellate review.

Justice Powell's view, among the relevant district court findings were that the plaintiffs' successful and unsuccessful claims involved a common core of facts and thus that the time devoted to unsuccessful and to successful claims could not reasonably be separated; that the total hours claimed were "fair and reasonable"; that the prevailing attorneys achieved "excellent results" for their clients; and that the case "vindicat[ed] important constitutional rights." 477 U.S. at 583, 106 S.Ct. at 2698–99. Justice Powell agreed with the plurality that neither Supreme Court caselaw nor the legislative history of § 1988 supported a "rule of proportionality" to govern the award of attorneys' fees in civil rights cases. However, Justice Powell also stated:

> Where recovery of private damages is the purpose of a civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought. In some civil rights cases, however, the court may consider the vindication of constitutional rights in addition to the amount of damages recovered.

477 U.S. at 585, 106 S.Ct. at 2700.

Justice Powell also opined in a "pregnant footnote," *Cunningham II*, 807 F.2d at 51, that "[i]t probably will be the rare case in which an award of *private damages* can be said to benefit the public interest to an extent that would justify the disproportionality between damages and fees reflected in this case." 477 U.S. at 586 n. 3, 106 S.Ct. at 2700 n. 3 (emphasis in original).[13]

This Court considered the *City of Riverside* decision in *Cunningham II*. The plaintiff in *Cunningham* sued the City of McKeesport and several of its officers under 42 U.S.C. § 1983 after her house and garage were demolished by the city without prior notice. The plaintiff obtained a $35,000 jury verdict, which the district court reduced to $17,000. Thereafter, she sought § 1988 counsel fees in the amount of $35,887.50, reflecting 358 hours of legal services at a rate of $100 to $125 per hour. The district court calculated a lodestar of $10,950, reflecting compensation at a $50 hourly rate for 219 hours of legal services. The court then applied a 50% negative multiplier, apparently reflecting its view that a further downward adjustment was warranted by the fact that the plaintiff's case was a personal action which did not vindicate the public interest. *See Cunningham v. City of McKeesport*, 753 F.2d 262, 268 (3d Cir.1985) ("*Cunningham I*"), *vacated and remanded*, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986), *reinstated*, 807 F.2d 49 (3d Cir.1986), *cert. denied*, 481 U.S. 1049, 107 S.Ct. 2179, 95 L.Ed.2d 836 (1987).

Our decision in *Cunningham I* to reverse and remand for recalculation of the fee was itself vacated and remanded by the Supreme Court for reconsideration in light of *City of Riverside*. On remand, we considered the proportionality issue to be the "preeminent question" on remand, *Cunningham II*, 807 F.2d at 52, as it was clear that the Supreme Court "plainly understood proportionality to be the central question posed by the [defendants' certiorari] petition." 807 F.2d at 50–51.

We noted in *Cunningham II* that both the plurality and Justice Powell found no basis for applying a proportionality standard to § 1988 fee awards. We considered applying "the thrust of Justice Powell's somewhat enigmatic footnote," which "ar-

---

**13.** Obviously, we are not unaware of the fact that Justice Powell's vote was decisive in the result in *City of Riverside* and that he is no longer on the Court. As lower court judges, we must assume that the Supreme Court will follow its recent precedent. However, even if a new majority of the Supreme Court were to adopt Justice Powell's analysis, we believe that this would be one of the "rare case[s] in which an award of *private damages* can be said to benefit the public interest to an extent that would justify [a] disproportionality between damages and fees." 477 U.S. at 586 n. 3, 106 S.Ct. at 2700 n. 3.

Stripped to its essentials, this case involves a coordinated and sometimes violent assault against a legitimate business by a group of individuals bent on shutting the business down. This is an apt description of the "pattern of racketeering activity" targeted by RICO. We thus find that the plaintiff's success in this litigation served to advance the important policy objectives underlying the civil RICO statute.

guably counsels a judge to consider the extent to which the public interest was vindicated by the award if the fee sought is disproportionate to the damages awarded." 807 F.2d at 53. However, we refrained from adopting that approach, stating:

First, this interpretation represents at most the view of a lone Justice and was not endorsed by any of the other eight.... Second, we have doubts about Justice Powell's statement that only the rare case justifies disproportionate fee awards. The facts of *City of Riverside* seem similar to those of a number of § 1983 cases that we have seen. If the facts of *City of Riverside* justify a "disproportionate" fee award, the facts in many if not most § 1983 cases should do so as well. Finally, we consider application of Justice Powell's reasoning problematic. The opinion sets out no method or standards by which a court might calculate the public interest served by a case, evaluate that interest in light of a disproportionality between damages and fees, and eventually settle upon a particular negative multiplier. In the absence of a specific mandate, we are reluctant to begin the difficult task of developing standards by which we might incorporate proportionality principles into the attorney's fee calculus.

807 F.2d at 53–54 (footnote omitted).

The defendants seek to distinguish the proportionality holdings of *City of Riverside* and *Cunningham II* on the ground that those decisions involved "attorney fee awards in the unique context of civil rights litigation." Appellants' Brief at 8, while the award in this case was under the RICO statute. The defendants point out that both the legislative history of § 1988 and Supreme Court caselaw emphasize the important congressional policy of encouraging private litigants to enforce vigorously their civil and constitutional rights in § 1983 actions, even in cases in which the potential damage recovery is small relative to the costs of litigation. According to the defendants, neither RICO's legislative history nor its interpretative caselaw supports such a policy, particularly in the context of a private RICO action "instituted by a for-profit corporation, for the redress of alleged injuries to its business." Appellants' Brief at 11. The defendants argue that a rule limiting RICO plaintiffs to proportional attorneys' fees awards is justified by civil RICO's treble damage provision. They also contend that a proportionality rule is warranted by the fact that "substantial" criminal activity that may be the subject of a civil RICO action could also be targeted by the state or federal authorities in a criminal RICO prosecution. Tr. Oral Arg. at 17–18.

We are unpersuaded by the defendants' contentions. At the outset, we observe that the facts of this case, perhaps in contrast to those in a more "typical" RICO business fraud action, do not present a particularly compelling background for a tightening of the requirements for the award of RICO attorneys' fees. The defendants were found liable under RICO on the basis of evidence showing a pattern of extortionate acts of harassment, vandalism, theft, and trespass—activities designed to prevent women from receiving medical services, including pregnancy testing and abortions, at the Center. *See Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d at 1350. We share the concern expressed by the Supreme Court about the unintended scope of the civil RICO statute, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499–500, 105 S.Ct. 3275, 3286–87, 87 L.Ed.2d 346 (1985), and recognize that the defendants, who state that they were acting on the basis of sincere moral convictions, are not the "archetypal, intimidating mobster[s]" that Congress perhaps had in mind when it drafted the RICO statute. 473 U.S. at 499, 105 S.Ct. at 3286. However, it is difficult to believe that civil RICO was not intended to reach this type of coordinated activity against a private business, especially one that performs lawful—indeed, constitutionally protected—medical services.

In any event, although the matter is not free from difficulty, we do not believe that *City of Riverside* and *Cunningham II* are distinguishable because of the different statutory authority for the award of attor-

neys' fees in this case. The fee-shifting provision of 18 U.S.C. § 1964(c) was borrowed from the analogous provision in Section 4 of the Clayton Act, 15 U.S.C. § 15.[14] *See Aetna Casualty and Surety Co. v. Liebowitz*, 730 F.2d 905, 907 (2d Cir.1984). The civil RICO attorneys' fees provision thus does not have the extensive legislative history of 42 U.S.C. § 1988, which was enacted in response to *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), in order to authorize the district courts to award attorneys' fees to prevailing parties in civil rights litigation. As the Supreme Court emphasized in *City of Riverside*, "Congress enacted § 1988 specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process." 477 U.S. at 576, 106 S.Ct. at 2695. The legislature considered that the potential recovery of attorneys' fee in civil rights cases would encourage litigants to act as private attorneys general, vindicating the important policies behind our civil rights laws. *Id.* at 575, 106 S.Ct. at 2694.

Although § 1988 may reflect Congress' particular solicitude toward civil rights litigants, we see nothing in the language or the legislative history of either § 1988 or § 1964(c) to support the application of a proportionality rule in the latter, but not the former. It is true that Congress was not explicit in stating the scope and objectives of civil RICO's fee-shifting provision. However, it is also clear that, like § 1988, the attorneys' fee clause of § 1964(c) was designed to encourage private litigants to promote the policies underlying the substantive legislation. As we recently observed, "Congress provided fee shifting to enhance enforcement of important civil rights, consumer protection, and environmental policies. By providing competitive rates we assure that attorneys will take such cases, and hence increase the likeli-

hood that the congressional policy of redressing public interest claims will be vindicated." *Student Public Interest Research Group of New Jersey, Inc. v. AT & T Bell Laboratories*, 842 F.2d 1436, 1449–50 (3d Cir.1988). In the absence of guidance from Congress or the Supreme Court, we cannot discern a convenient standard to measure and compare the "public interest" served by the civil RICO and civil rights statutes, nor can we see how to "evaluate [the public] interest in light of a disproportionality between damages and fees, and eventually settle on a particular negative multiplier." *Cunningham II*, 807 F.2d at 54.

The defendants contend that the treble damages feature of civil RICO shows Congress' intent to encourage private litigation through the promise of large verdicts, rather than through the potential for substantial fee awards. The defendants' argument is not implausible, but is again based on a speculative interpretation of legislative intent. The treble damages and fee shifting provisions serve the same purpose of encouraging private citizens to enforce the objectives of the RICO statute—the former, by increasing the potential damages; the latter, by ensuring that the plaintiff's recovery will not be diminished by counsel fees. Had Congress believed that treble damages alone would be sufficient to encourage private litigation, or that attorneys' fees should be awarded only in some proportion to the plaintiff's damages, it could have easily eliminated or modified the attorneys' fees provision of § 1964(c). We shall not impose such a change by judicial fiat.

As for the defendants' contention that the RICO statute provides for both civil and criminal penalties, we need only point out that the fact that the government may bring a criminal action under 18 U.S.C. §§ 241–47 for violation of an individual's civil rights did not deter the Supreme Court in *City of Riverside* from rejecting the

---

**14.** The civil RICO provision tracks the language of § 4 of the Clayton Act which provides in relevant part that

> any person who shall be injured in his business or property by reason of anything forbid-

> den in the antitrust laws ... shall recover threefold the damages by him sustained and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

proportionality rule in the civil rights context. We do not see how the possibility of criminal prosecution under RICO would support a contrary holding in this case.

We thus conclude that the district court properly refused to apply a proportionality rule to reduce the RICO fee award in this case.

### B.

### *Failure to Exercise Discretion*

■ We also disagree with the defendants' alternative argument that the district court failed to exercise its discretion to "tak[e] the small amount of plaintiff's RICO verdict into consideration when ruling on its motion for fees and costs." Appellants' Brief at 13–14.

As stated above, under the reasoning of *City of Riverside* and *Cunningham II*, we cannot adopt a *rule* of proportionality for RICO attorneys' fee awards. We need not now resolve the broad issue of whether, and to what extent, those decisions leave the district courts with the *discretion* to take proportionality into account in setting fee awards. Under the circumstances of this case, which include (1) the district court's well-supported finding that the "novelty and complexity of the legal and factual issues presented and the time, labor, and effort required to successfully present the RICO claim" justified a substantial RICO fee award, App. at 315 [15]; (2) the court's careful reduction of the hours related to non-compensable claims and activities; and (3) the lack of a basis for concluding that the damage award re-

flected the jury's view that the plaintiff prevailed only on a distinct aspect of its case, we cannot conclude that the court abused or failed to exercise its discretion in determining the fee award. [16]

### C.

### *Calculation of Lodestar*

The defendants challenge the district court's calculation of the lodestar on two related bases. First, the defendants assert that the court failed to reduce the hours claimed to eliminate compensation for time spent on non-RICO claims. Second, they contend that the award was based on an "unspecific and insufficient" fee petition.

As an initial matter, we reiterate our longstanding deference to the district court's factual determinations in attorneys' fees decisions.

> [T]he appellate court may not upset a trial court's exercise of discretion on the basis of a visceral disagreement with the lower court's decision. Similarly, the appellate court may not reverse where the trial court employs correct standards and procedures, and makes findings of fact not clearly erroneous. In sum, "[i]f the district court has applied the correct criteria to the facts of the case, then, it is fair to say that we will defer to its exercise of discretion."

*Lindy II*, 540 F.2d at 116, *quoting Katz v. Carte Blanche Corp.*, 496 F.2d 747, 756 (3d Cir.) *(in banc)*, *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). *See also Hensley*, 461 U.S. at 437, 103 S.Ct. at

---

**15.** We note that the plaintiff established RICO liability as to twenty-six of the thirty-one defendants who remained in the case at trial. To do so, the Center had to marshal evidence concerning the defendants' pattern of racketeering activity, and present that extensive evidence and testimony in a coherent manner to the jury over the course of a three week trial.

**16.** The court denied the plaintiff's motion for an award of attorney's fees under the bad faith exception to the American Rule. App. at 316. Although the Center insists in its brief that the underlying litigation was unnecessarily extended by the defendants' allegedly vexatious and dilatory litigation tactics, Appellee's Brief at 4–8, it did not appeal the district court's denial of

attorney's fees pursuant to the bad faith exception. Thus, we need not determine whether the defendants' litigation methods constitute an independent basis for the award of attorney fees.

We note, however, that many of the hours expended by plaintiff's counsel were necessitated by the defendants' vigorous trial and pretrial litigation. In speaking of the *City of Riverside* petitioners' failure to make a reasonable, timely settlement offer, the Supreme Court observed that "'[t]he government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.'" 477 U.S. at 580 n. 11, 106 S.Ct. at 2697 n. 11, quoting *Copeland v. Marshall*, 641 F.2d 880, 904 (D.C.Cir.1980) *(en banc)*.

1941 ("We reemphasize that the district court has discretion in determining the amount of the fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.").

The need to adhere to this standard of deference is manifest, especially in light of the large number of appeals from attorneys' fees decisions.[17] The determination of "reasonable" attorneys' fees is a difficult enough task for the district court judge, who must set an appropriate hourly rate, time expenditure, and multiplier on the basis of his or her usually limited and sporadic involvement in the underlying litigation. However, an appellate court, which relies on a cold record, is even more poorly positioned to assess the nature and quality of the legal services performed at the trial court level. We recognize the limitations of appellate review of attorneys' fees decisions, and we remain concerned that the fee proceedings in many cases threaten to "assume massive proportions, perhaps even dwarfing the case in chief." *Lindy II*, 540 F.2d at 116.

▊ With this in mind, we shall not disturb the district court's calculation of the lodestar. As the court correctly held, the fee award must exclude compensation for hours spent on unsuccessful claims or on distinct successful claims for which there is no statutory fee-shifting authority. *See Baughman*, 583 F.2d at 1215–16 (fee award must exclude compensation for hours devoted to non-compensable state law claims). Recognizing that the RICO count was the plaintiff's only successful fee shifting claim, the court reduced the

fee demand by $22,264.35 to exclude compensation for proceedings related exclusively to the plaintiff's trespass claim, its unsuccessful antitrust count, and its litigation against the defendant who won the j.n.o.v. The court also cut back the fee demand by $1,487 to exclude compensation for time spent on various contempt motions.

We believe that the lodestar determination was adequately supported by the court's factual findings and was thus well within its discretion. The court found that the RICO claims and the pendent trespass and intentional interference with contract claims made up the "bulk of the litigation"; that the trespass and RICO claims were proven by the same evidence; and that "[m]uch of counsel's time was devoted to the development of the evidence and the litigation as a whole." App. at 313. We note that similar findings by the district court in *City of Riverside* moved Justice Powell to concur in the judgment affirming the fee award, despite his serious reservations about its disproportionality. 477 U.S. at 583–84, 106 S.Ct. at 2698–99 (Powell, J., concurring).

In cases in which the plaintiff's successful and unsuccessful claims involve a common core of facts or related legal theories, or where much of counsel's time is dedicated to the litigation as a whole, it is often impossible to divide counsel's time on a precise claim-by-claim basis. *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. *Inmates of Allegheny County Jail*, 716 F.2d at 181. Here, after making substantial deductions in the hours claimed relating to non-RICO claims and determining that the interrelatedness of the plaintiff's claims made further deductions unwarranted, the court

---

**17.** Last year alone, this Court published at least six opinions in appeals involving challenges to awards or denials of statutory attorneys' fees and costs. *Mayberry v. Walters*, 862 F.2d 1040 (3d Cir.1988) (denial of § 1988 award); *Bethenergy Mines Inc. v. Director, Office of Workers' Compensation Programs*, 854 F.2d 632 (3d Cir. 1988) (Black Lung Benefits Act award); *Friedman v. Ganassi*, 853 F.2d 207 (3d Cir.1988) (Securities Act award), *cert. denied*, 109 S.Ct. 867 (1988); *Student Public Interest Research Group of New Jersey, Inc. v. AT & T Bell Labora-*

*tories*, 842 F.2d 1436 (3d Cir.1988) (Clean Water Act award); *Dunn v. U.S.*, 842 F.2d 1420 (3d Cir.1988) (EAJA award); *Muth v. Central Bucks School District*, 839 F.2d 113 (3d Cir.1988) (Education of the Handicapped Act award), *rev'd sub nom. Dellmuth v. Muth*, —— U.S. ——, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989).

This number reflects only a portion of the 1988 attorneys' fee appeals in this Circuit, as many of our cases are resolved by summary affirmances or unpublished opinions and memorandum orders.

found that the remaining hours were reasonable in light of the nature and complexity of the plaintiff's RICO claim. App. at 315. Our review of the record provides no basis for setting aside the findings of the trial court.

▇ Finally, the defendants contend that the court erred in awarding fees based on a petition that did not sufficiently identify the hours spent by the plaintiff's attorneys on the plaintiff's different claims. The defendants acknowledge that the plaintiff's counsel's time sheets allocated a number of hours between the plaintiff's RICO and non-RICO claims, and that the court did reduce the initial fee demand by a substantial sum to take into account litigation related to the non-RICO claims. However, the defendants argue that "the court's deductions do not go far enough," and assert that the district court impermissibly shifted the burden of proof when it stated that the defendants had failed to make a properly supported challenge to the claimed hours. Appellants' Brief at 19.

As the defendants point out, the Center bears the burden of showing that the claimed rate and number of hours are reasonable in light of the litigation on its RICO claim. However, the plaintiff has met its burden here by submitting detailed time sheets with its fee petition, which separate to an appropriate degree the time spent on the plaintiff's various claims. App. at 153–92. Although the defendants are not satisfied with the extent of the court's reduction of the fee demand, its fee decision is adequately supported by the record in this case, including the documentation accompanying the fee petition. Contrary to the defendants' contention, the court's observation that the defendants did not present affidavits or hearing evidence controverting the hours claimed by plaintiff hardly amounts to a shifting of the burden of proof. "In statutory fee cases, ... when an opposing party has been afforded the opportunity to raise a material fact issue as to the accuracy of representations as to hours spent, or the necessity for their expenditure, and declines to do so, no reason occurs to us for permitting the trial court to disregard uncontested affidavits filed by a fee applicant." *Cunningham I,* 753 F.2d at 267. Accordingly, we conclude that the district court did not abuse its discretion in calculating the lodestar.

### III.

While defendants may have strong convictions against the wisdom or morality of women making a voluntary decision to obtain an abortion, under our Constitution and laws there is in this country no superior, dominant ruling class of citizens who may escape the consequences of their violent and lawless behavior. Neither those who believe strongly in the "right to life" nor those who believe fervently in "freedom of choice" have any special immunity from the operation of the rule of law in our society.

The trial judge was the epitome of a careful and restrained jurist who evaluated with impartiality the defendants' claims and gave them every benefit of the doubt. On this record, the defendants are not entitled to another scintilla of further relief or reduction of damages or attorneys' fees.

For the foregoing reasons, the judgment of the district court will be affirmed.